IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

KENNETH J. LEE                    §
                                  §
VS.                               §
                                  §     CIVIL ACTION NO.4:08-CV-542-Y
ALLIED PILOTS                     §
ASSOCIATION, ET AL.               §

OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

        Pending before the Court is Defendants' Motion for Summary Judg-
ment on Plaintiff's Remaining Claims (doc. #32).  Also before the Court
is Plaintiff's Motion for Summary Judgment (doc. #35).  After review,
the Court concludes that the decision to terminate Plaintiff's partici-
pation in an employee benefit plan was legally correct and, in any
event, not an abuse of discretion.  The Court further concludes that
an exclusion that was applied to deny Plaintiff benefits after he re-
enrolled in the plan was properly adopted and applied to him.  Accord-
ingly, Defendants' motion for summary judgment will be granted and
Plaintiff's motion for summary judgment will be denied.


I.  Factual Background

        Plaintiff, Kenneth Lee, began his employment with American Air-
lines ("AA") in April 1985. (Pl.'s Mot. App. at 2.)  After a one-year
probationary period, Lee became a member of defendant Allied Pilots
Association ("APA").  (*Id.*)  APA is the administrator of the Allied
Pilots Association Disability Income Plan (Loss of License) ("the
Plan"), a disability-insurance plan provided for AA pilots.  (*Id.* at
75.)  The APA has delegated fiduciary responsibilities for deciding
claims to Plan benefits to the Benefits Review and Appeals Board ("the
BRAB").  (Def.'s Mot. App. at 1, 23-24.)  Lee applied to participate

in the Plan and was enrolled effective April 1, 2000. (Pl.'s Mot. App. at 2, 75.)

In January 2004, Lee, a United States Marine Corps reservist, was called to active duty in Iraq. (Pl.'s Mot. App. at 2.) Lee remained on active duty until May 21, 2005. (*Id.* at 2, 4, 82-83.) According to Defendants, when called to active duty, Lee took a military leave of absence. (Def.'s Mot. App. at 48). In support, Defendants point to a notice sent to Lee by the third-party administrator for the APA that states: "According to our records, you went on Military Leave of Absence on January 13, 2004." (*Id.*) Under the terms of the Plan, a participant's coverage terminates upon the earliest of certain speci-fied events. (Pl.'s Mot. App. at 14-15.) The notice sent to Lee recites the Plan's termination provision relevant to a military leave of absence, which provides that coverage ceases "twelve (12) months after the date [a participating pilot] takes a military leave of absence." (Def.'s Mot. App. at 48.) Lee does not challenge that he was on a military leave of absence while on active military duty. Indeed, Lee acknowledges that he did not terminate his employment with AA, that he did not use accumulated vacation time to cover his absence from work while on active military service, and that he intended to return to work for AA after his active service and to continue to fly for AA until reaching the age of sixty. (Pl.'s Mot. App. at 2; Pl.'s Resp. App. at 2.) Instead, Lee complains that he did not "take" a military leave within the meaning of the Plan because he was involun-tarily called into active service. (*Id.* at 83.)

On January 13, 2005, after Lee had been on military leave of absence for twelve months, Lee's Plan coverage was terminated. (*Id.* at 15, 77.) Upon returning from active duty, Lee applied for rein-

2

statement to the Plan. (*Id*. at 77-78; Def.'s Mot. App. at 54-55.)  Lee was instead re-enrolled in the Plan with a new effective enrollment date of August 1, 2005. (Pl.'s Mot. App. at 78; Def.'s Mot. App. at 54-55.)

While Lee was in active military service, on November 15, 2004, the APA's board of directors approved a resolution amending the Plan to exclude from its coverage a claim based on a disability arising within six months of the participant's effective enrollment date unless the injury giving rise to the disability occurs after the effective date ("six-month exclusion"). (Def.'s Mot. App. at 7-9, 19, 59.)  Plan participants were notified of this amendment on December 13, 2004, by a Summary of Material Modifications ("SMM"). (*Id*. at 3, 107-08.)  The SMM was signed by the APA's president, and a copy was sent to Lee's address of record with the APA and its third-party administrator. (*Id.*)  The APA's president signed the amendment itself on April 12, 2005. (*Id*. at 9.)

In March 2000, Lee was diagnosed with Type II diabetes. (Pl.'s Mot. App. at 84.)  By August 22, 2005, Lee's diabetes had worsened to the point that Lee required insulin therapy, and he was disqualified from obtaining the Federal Aviation Administration medical certificate necessary to maintain his pilot's license. (*Id*. at 86.)  As a result of this disqualification, Lee applied for disability benefits under the Plan. (*Id*. at 87.)  Because Lee's disability occurred within six months after his August 1, 2005, enrollment date and the cause of that disability *preceded* his enrollment date, his application was denied. (*Id*. at 5-8, 87.)  Lee appealed the denial but the denial was confirmed. (*Id.*)

3

Lee then filed this suit under the Servicemembers Civil Relief Act ("SCRA") and the Employee Retirement Income Security Act ("ERISA"). Under the SCRA, Lee argues that he was entitled to reinstatement into the Plan, rather than re-enrollment with a new effective date, upon his return from active duty. If this were the case, Lee's effective date would be his original effective date of April 1, 2000, and his now disabling diabetic condition would not be subject to the six-month exclusion. The Court has already granted summary judgment in favor of Defendants on this claim, concluding that the SCRA entitles a military servicemember, under certain conditions, to reinstatement of health insurance and that the Plan, designed as it is to compensate partici- pants for income lost due to disability, is not health insurance and, therefore, is not governed by the SCRA. *See Lee v. Allied Pilots Ass'n*, No. 4:08-CV-542-Y, 2009 U.S. Dist. LEXIS 59794, 2009 WL 2030424 (N.D. Tex. July 14, 2009).

Now before the Court are the cross motions for summary judgment by Lee and Defendants addressing Lee's ERISA claim. Lee has raised three arguments in connection with his ERISA claim. First, Lee con- tends that he was involuntarily called to active military service and thus did not "take" a military leave of absence as contemplated by the Plan. Second, Lee contends that the six-month exclusion was not properly adopted and should not be applied to him. Finally, Lee contends that Defendants should be estopped from denying him benefits under the Plan because the Plan accepted contributions while he was on military leave.

II. Legal Discussion

    A.  Standard of Review on Motion for Summary Judgment

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the court's function is

not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not produce evidence showing the absence of an issue of fact with respect to an issue on which the nonmovant bears the burden of proof, however. Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim. *See id.* at 323-25. But when the moving party bears the burden of proof on the claim for which it is moving for summary judgment, it must produce evidence establishing "beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190,1194 (5th Cir. 1986). Such a movant's showing must be such that the court can conclude that no reasonable trier of fact could find other than for the movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the  evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

When the movant has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material

facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

B.   Standards of Review in ERISA-Plan Context

In addition to these standards, the Court's analysis of the summary judgment motions will be guided by the deference owed to the BRAB's decision.   That is, the Court is not simply reviewing the evidence to determine whether there is a genuine issue of material fact.  In making a benefit determination, a plan administrator performs two tasks. *See Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 537 (5th Cir. 2007).  The administrator must "determin[e] the facts underlying the benefit claim." *Id.*   "The administrator's factual determinations are reviewed for abuse of discretion." *Id.*   Thus, the BRAB's factual determinations made on behalf of the APA will be reviewed with "due deference [to the extent they] reflect a reasonable and impartial judgment." *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1563 (5th Cir. 1991).

The administrator must then "determine whether those facts constitute a claim to be honored under the terms of the plan." *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998).  This step generally involves a determination of eligibility, *see Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 636 (5th Cir. 1992), and may include construction of the terms of the plan.  *See Wade*, 493 F.3d at 537.  If an administrator has discretionary authority in making these determinations, a court is to review the administrator's determinations for an

abuse of discretion. *See id*. at 537-38; *see also Wildbur*, 974 F.2d at 636. In this case, the Plan documents expressly grant to those charged with administering the Plan "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to any Plan benefits in accordance with the terms of the Plan." (Def. Mot. App. at 25-26.)

Generally, a court reviews an administrator's exercise of its discretionary authority to deny plan benefits in two steps. First, a court evaluates whether the administrator's decision was legally correct. *See Chacko v. Sabre, Inc*., 473 F.3d 604, 611 (5th Cir. 2006). "[I]f so, the inquiry ends because no abuse of discretion could have occurred." *Id*. If the administrator's decision was not legally correct, the court must determine whether the decision was an abuse of discretion with reference to three factors: (1) whether the administrator has given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. *Id*. "[T]his process is not rigid" and, when a court can "more readily determine that the [administrator's] decision was not an abuse of discretion," the court may forgo determining whether the decision was legally correct. *See Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 n.2 (5th Cir. 2009).

An administrator's decision is not an abuse of discretion if it "is supported by substantial evidence and is not arbitrary and capricious." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reason-

able mind might accept as adequate to support a conclusion." *Id*. (quotation marks and citation omitted). A decision is arbitrary if it is "made without a rational connection between the known facts and the decision." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (quotation and citation omitted).

        C.   The Combined Standards of Review

        An appropriate marrying of the overarching summary-judgment standard of review with the standards applied in ERISA denial-of-benefits cases results in this guidepost: Where, in the summary-judgment context, the movant is the plan administrator and that administrator seeks affirmation of its decision on a participant's demand for benefits, the movant administrator does not have the burden of proof on the issue. *See Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 644 (5th Cir. 1997) ("[Plaintiff] carries the burden of proving that Blue Cross arbitrarily and capriciously concluded that the medical test and treatments were medically unnecessary and therefore not covered under the policy.") (citing *Bayles v. Cent. States, Se. & Sw. Areas Pension Fund*, 602 F.2d 97, 99 (5th Cir. 1979) ("According to the clear weight of federal authority, the actions of the trustees in the administration of the pension plan must be sustained as a matter of law unless plaintiff can prove such activities have been arbitrary or capricious.")). Accordingly, the administrator must only point out that the evidentiary documents in the record contain insufficient proof to raise a genuine issue of fact that the administrator's decision is legally incorrect and, if incorrect, then unsupported by substantial evidence of (1) non-uniform plan construction; (2) an interpretation of the plan inconsistent with a fair reading of the plan; (3)

unanticipated costs from inconsistent interpretations--and is thus arbitrary and capricious.

III.  Analysis

   A.  Did Lee "Take" a Military Leave of Absence

   Lee first argues that his participation in the Plan should not have been terminated on January 13, 2005, because he did not "take" a military leave of absence.  Instead, he was involuntarily called to active military service and, according to Lee, as used in the Plan, "take" connotes a voluntary action.  Lee argues that if his participation in the Plan were not improperly terminated, he would not have had to re-enroll with a new effective participation date of August 1, 2005, and his now disabling diabetic condition would not be subject to the six-month limitation.

   Defendants respond with a number of arguments showing that the BRAB's interpretation--that a participant's enrollment is to be terminated once the participant has remained for twelve months on a military leave of absence regardless of whether the underlying military service is voluntary--is a fair interpretation of the Plan and one that the BRAB has uniformly applied.  These arguments make it apparent that the BRAB did not abuse its discretion in interpreting and applying the military-leave provision.  Thus, the Court need not address whether that decision was legally correct.  *See* 576 F.3d at 246 n.2.

   Lee argues, and the Court agrees, that the terms of an ERISA plan should be interpreted in the "ordinary and popular sense as would a person of average intelligence and experience." *Jones v. Georgia Pacific Corp.*, 90 F.3d 114, 116 (5th Cir. 1996).  ERISA plans should be interpreted "as they are likely to be understood by the average plan

participant, consistent with the statutory language." *See Tucker v. Shreveport Transit Mgmt., Inc*., 226 F.3d 394, 398 (5th Cir. 2000). Lee insists that "take," in its ordinary and popular sense, indicates a voluntary act.

But "take" is not limited to voluntary actions. Independent from the context of the Plan, as relevant to this case, "take" simply means to "avail oneself of for use" and can be used with regard to acts a person engages in "whether willingly or reluctantly." Webster's Third New International Dictionary 2330 (1986). The context provided by the Plan further confirms that "take" can be used with regard to involuntary acts. As highlighted by Defendants, the drafters of the Plan made it clear when the Plan meant to distinguish between voluntary and involuntary actions. Indeed, the provision immediately preceding the military-leave provision provides that a participant's coverage terminates "Ninety (90) days after the Member takes a *voluntary* leave of absence from the Company" (Def. Mot. App. at 16.) Given the proximity of this provision to the military-leave provision, the military-leave provision's lack of the qualifier "voluntary" is conspicuous and indicative of the drafter's intent.

And as argued by Defendants, even assuming the word "take" does imply voluntary action, that voluntary action would refer to the leave of absence, not to the underlying military service. That is, the military-leave provision provides that a Plan participant's coverage is terminated "twelve (12) months after the date [a participating pilot] *takes a military leave of absence*." (Def.'s Mot. App. at 48 (emphasis added).) Lee's complaint is that his military service was not voluntary. But his taking leave was voluntary because he made a voluntary decision to accommodate that service by notifying AA of his

11

call to service, expressing his intent to return, and opting for a leave of absence rather than for terminating his employment with AA or using accumulated vacation time to cover his absence.

Lee complains that these alternatives are not feasible, are unfavorable, and that the BRAB's interpretation displays an anti-military attitude. But such policy-based complaints are no response to Defendants' arguments, which are founded on the text of the Plan. *Cf. Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 939 (5th Cir. 1993) (concluding that, while a beneficiary's understanding of plan documents is important, a court's interpretation must be based on the language of the document). Lee also insists that an ERISA plan's terms are to be construed against the drafter and in favor of the employee. *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981-82 (5th Cir. 1991). But this assumes that there is an ambiguity to construe, and Lee has not shown that one exists.

And the BRAB has consistently interpreted the military-leave provision to apply without regard for whether the underlying military service is voluntary. In support of their motion for summary judgment, Defendants have provided the sworn declaration of Kenneth Knoerr, director of benefits for the APA. In his declaration, Knoerr states that the Plan's military-leave provision has consistently been applied without regard for whether the underlying military service was voluntary or involuntary. (Def.'s Mot. App. at 2.)

Lee seeks to have Knoerr's declaration stricken as conclusory and not based on personal knowledge. Knoerr states that as the director of benefits for the APA, he has been charged with overseeing the operation of the Plan since 1995, which called for him to have knowledge of how the BRAB interpreted and applied the Plan. This is a

sufficient basis to conclude that Knoerr has personal knowledge of how the Plan has been interpreted. *Cf*. Fed. R. Evid. 602 (stating a witness's own testimony may be sufficient to show personal knowledge). Lee complains that Knoerr's statement regarding the interpretation of the military-leave provision is conclusory because Knoerr does not discuss examples of applications of the provision. Although Knoerr's statement regarding the interpretation of the military-leave provision is dependent on his knowledge of facts not discussed in his declaration, given that Knoerr is in a position to be aware of those facts, Lee's arguments do not show that this Court should disregard Knoerr's statement as unsupported or conclusory. *See Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (characterizing as conclusory affidavit testimony that is unsupported); *see also Gossett v Du-Ra-Kel Corp.*, 569 F.2d 869, 872-73 (5th Cir. 1978) (concluding that statements in an affidavit in support of a defendant's summary-judgment motion, although of a conclusory character, were sufficient to show lack of factual issue because plaintiffs either failed to challenge them or failed to support their challenges with specific factual assertions).

As argued by Defendants, despite the fact that the interpretation of the military-leave provision has been at issue since the filing of this case, Lee has come forward with no evidence or specific examples showing that the Plan has ever been interpreted to apply only to voluntary military service. Lee does state in his own declaration that he is "not aware that [the APA] has enforced the [military-leave provision] against a member involuntarily called to perform military service." (Pl.'s Resp. App. at 3.) But this testimony does not create a fact issue as to how the Plan has been interpreted because Lee is

13

testifying to a lack of knowledge, not known facts that are contrary to the facts to which Knoerr testified.  That is, Knoerr testified that the Plan had consistently been administered without regard for whether the military service underlying a military leave is voluntary or involuntary.  Lee has not provided evidence that the Plan's administrators have previously considered whether the underlying military service is voluntary.  Hence, Lee has not created a factual dispute on this point.  *See Liquid Air Corp.*, 37 F.3d at 1075 (stating a factual dispute exists "when both parties have submitted evidence of contradictory facts"); *also cf. Gossett*, 569 F.2d at 872-73.

Neither Defendants nor Lee discuss the third factor--unanticipated costs associated with other interpretations of the Plan.  But in light of the foregoing, the Court concludes that the Plan has been interpreted consistently and that such interpretation is a fair one given the Plan's language.  Thus, the Court concludes that the BRAB's decision was not an abuse of discretion.

B.  Adoption and Application of the Six-Month Exclusion

Lee next argues that the six-month exclusion is not applicable to him because his participation in the Plan was terminated in January 2005, and the six-month exclusion did not become effective until April 12, 2005, when the resolution passed by he APA's board of directors was signed by the APA's president.  But as noted by Defendants, even if these facts are taken as true, Lee provides no authority to support his position regarding their consequences.  Lee has pointed to nothing in either the Plan, the law, or logic that, to be effective, the six-month exclusion provision must have been adopted prior to the termination date of his participation in the Plan.  Nor has Lee explained why,

14

given the APA president's signing the six-month exclusion period into effect[1] months before his re-enrollment on August 1, 2005, the exclusion would not apply to him.

Lee does, however, argue that the six-month exclusion is not applicable to him because he did not receive actual or otherwise effective notice of the APA's adoption of the six-month exclusion or of the BRAB's decision to terminate his original participation in the Plan.  Lee's argument on this point is similar to the one he made under the SCRA:  If his original participation had not been terminated, he would not have been re-enrolled with a new effective date and his debilitating diabetic condition would have arisen well beyond six months after his enrollment date, making the six-month exclusion inapplicable.  Lee's argument continues that, regardless of his effective date, the six-month exclusion cannot be applied to him because he was not properly notified of its adoption.

ERISA requires that a plan administrator furnish timely notice of an amendment to each plan participant.  *See* 29 U.S.C. § 1024(b).  "[A]n amendment to a welfare benefit plan is valid despite a beneficiary's lack of personal notice, unless the beneficiary can show active concealment of the amendment, or some significant reliance upon, or possible prejudice flowing from the lack of notice."  *Godwin v. Sun Life Assurance Co.*, 980 F.2d 323, 328 (5th Cir. 1992) (citations omitted).  Defendants sent Lee notice of the adoption of the six-month exclusion on December 13, 2004, by way of an SMM signed by the APA's president, to the only address Lee ever provided to the APA. (Def.'s

---

[1]   In addressing the effective date of the six-month exclusion amendment, Defendants point out that the president signed a letter sent to Lee informing him of the amendment on December 13, 2004, and argue that this was sufficient to make the amendment effective.  Defendants do not provide any detailed analysis of this point and Lee provides no response.  The Court need not resolve this issue, however, because the uncontradicted evidence is that the APA's president officially signed the amendment into effect on April 12, 2005.  (Pl.'s Mot. App. at 78.)

Mot. App. at 3, 107-08.)  Similarly, Defendants sent Lee a letter in October 2004 warning Lee that his coverage would be terminated on January 13, 2005, if he remained on military leave of absence through that date.  (*Id.* at 48.)  Lee has produced no evidence that the APA or the BRAB actively attempted to conceal the amendment adopting the six-month exclusion or of the fact of his termination.  Moreover, Lee acknowledges having received notice of both the Plan's adoption of the six-month exclusion and of his termination by June 2005.  At the time he signed up for the Plan in July 2005, Lee knew both that he had been terminated and that the APA had adopted the six-month exclusion. Additionally, Lee was provided with a copy of the Plan document, as it existed in July 2005, including the six-month exclusion, upon signing up.  (Def.'s Mot. App. at 5, 54.)  In light of these circumstances, the Court concludes that Lee was provided adequate notice of the APA's adoption of the six-month exclusion and of his termination.  The Court further concludes that Lee has failed to show that the APA's adoption of six-month exclusion or the BRAB's application of the exclusion to Lee was an abuse of discretion.

### 3.  Estoppel

In their motion, Defendants argue that judgment on Lee's estoppel claim should be entered in their favor because Lee has failed to present evidence in support of any of the essential elements of that claim.  Lee presents no counter argument or evidence on this claim in his response brief, and he does not address this claim in his own motion for summary judgment.  Because Lee failed to present evidence in support of this claim in response to Defendants' motion for summary judgment and has failed to even argue in support of this claim, summary judgment will be entered on it in favor of Defendants.  *See Liquid Air*

*Corp.*, 37 F.3d at 1075 (stating that once the moving party asserts that there is no genuine issue of material fact as to an essential element of the nonmovant's claim, the nonmovant must respond by producing evidence showing a genuine issue for trial exits); *United States v. Torres-Aguilar*, 352 F.3d 934, 936 n.2 (5th Cir. 2003) (concluding that a claim was abandoned by a party who failed to provide legal or factual analysis of it).

III.   Conclusion

In light of the foregoing, the Court concludes that the BRAB's interpretation of the Plan's military-leave provision was not an abuse of discretion.  The Court further concludes that the six-month exclusion was effective when applied to deny Lee benefits, and that Lee had adequate notice of both the APA's adoption of the six-month exclusion and of the original decision to terminate his participation in the Plan.  Thus, neither the APA's adoption of the exclusion nor the BRAB's application of it to deny Lee benefits was an abuse of discretion. Finally, the Court concludes that Lee has waived his estoppel claim.

Consequently, Defendants' motion for summary judgment is GRANTED and Lee's motion for summary judgment is DENIED.

SIGNED: March 8, 2010.

_Terry R. Means_

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE